IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

HAKIM ALI BRYANT,                    :    CIVIL ACTION
                                     :    NO. 10-6111
          Plaintiff,                 :
                                     :
     v.                              :
                                     :
CITY OF PHILADELPHIA, et al.,        :
                                     :
          Defendants.                :


M E M O R A N D U M

EDUARDO C. ROBRENO, J.                      SEPTEMBER 12, 2012


## I.    INTRODUCTION

Hakim Ali Bryant ("Plaintiff") brought this civil rights
action against the City of Philadelphia, Police Officer Hoover
("Hoover"), and the City of Philadelphia Police Officers from
the SWAT unit, Joseph Cooney, Manus Cassidy, Inocencio Amaro,
Cyprian Scott, Sean Leatherberry, Erik Bullock, Todd Lewis,
William McDonald, Robert DiBasio, Sgt. Joseph McDonald and Sgt.
Austin Fraser (collectively "Defendants"). Plaintiff filed this
complaint pursuant to 42 U.S.C. § 1983, alleging violations of
his First, Fourth, Sixth, Eighth, and Fourteenth Amendment
rights, including unreasonable seizure, false arrest, excessive
force, and failure to intervene.[1]

---

[1]    Although Plaintiff did not specifically articulate all of
these claims in his amended complaint, the Court liberally

On January 30, 2012, this Court ruled upon Defendants' motion for summary judgment, and the only claims that remained for trial were Plaintiff's Fourth Amendment claims for unlawful seizure, false arrest, excessive force, and failure to intervene against Defendants Sean Leatherberry, Erik Bullock, and Austin Fraser.

Plaintiff proceeded pro se in this matter. At the trial he was permitted to testify by giving a narrative with the assistance of the Court. All Defendants were represented by the same counsel for the City Solicitor's Office.

Following a bench trial and pursuant to Federal Rule of Civil Procedure 52(a), this Memorandum constitutes the Court's findings of fact and conclusions of law. For the reasons that follow, the Court will grant judgment in favor of Defendants Leatherberry, Bullock, and Fraser on Plaintiff's claims of unlawful seizure, false arrest, excessive force, and failure to intervene.

---

construed his pro se pleading in light of his response to Defendants' motion for summary judgment. See United States v. Otero, 502 F.3d 331, 334 (3d Cir. 2007) (citing Haines v. Kerner, 404 U.S. 519, 520 (1972)).

[2]    The case was originally set for trial on June 20, 2012, however it was postponed due to irreconcilable witness conflicts. The trial in this case occurred on August 16, 2012. See Order, July 2, 2012, ECF No. 27.

[3]    Defendant Bullock was produced for a video-taped deposition

## II.  PROCEDURAL BACKGROUND

On August 1, 2011, Defendants filed a motion for partial summary judgment. Mot. Summ. J., ECF No. 16. Plaintiff filed his response to the motion for partial summary judgment on August 18, 2011. Pl.'s Resp., ECF No. 17. The Court granted Defendants' motion on all of Plaintiff's claims against the City of Philadelphia as well as on all claims pursuant to the First, Sixth, Eighth, and Fourteenth Amendments. Mem. Op. 2-3, ECF No. 19. The Court also granted summary judgment in favor of Defendants Hoover, Cooney, Cassidy, Amaro, Scott, Lewis, Sgt. McDonald, DiBiasio, and William McDonald with respect to the excessive force claim, unreasonable seizure claim, false arrest claim, and failure to intervene claims to prevent the use of excessive force, unreasonable seizure and false arrest. Id. at 3. Therefore, the case proceeded to trial on Plaintiff's Fourth Amendment claims for unlawful seizure, false arrest, excessive force, and failure to intervene as against Defendants Police Officer Sean Leatherberry ("Leatherberry"), Police Officer Erik Bullock ("Bullock"), and Sergeant Austin Fraser ("Sgt. Fraser"). Id. at 3, 16; See Order, January 30, 2012, ECF No. 20.

On March 21, 2012, this Court held a final pretrial conference in the case and gave Plaintiff thirty days to consult with at least three attorneys to assess whether they would be willing to represent him in this case. After a discussion with

3

Plaintiff about his inability to retain counsel on April 26, 2012, the Court scheduled a non-jury trial upon Plaintiff's request. ECF Nos. 25, 26.[2]

On August 16, 2012, the Court held a bench trial at the conclusion of which it heard closing argument. The Court has reviewed all of the admitted evidence in this case: Plaintiff's testimony, Janet Armour's testimony, Detective Hoover's testimony, Officer Leatherberry's testimony, Sgt. Fraser's testimony, Officer Bullock's testimony,[3] and each party's supporting exhibits. Upon this record, the Court makes its findings of facts and conclusions of law.

### III. JURISDICTION

The Court has jurisdiction over Plaintiff's constitutional and federal law claims. See 28 U.S.C. §§ 1331, 1343.

---

[2]   The case was originally set for trial on June 20, 2012, however it was postponed due to irreconcilable witness conflicts. The trial in this case occurred on August 16, 2012. See Order, July 2, 2012, ECF No. 27.

[3]   Defendant Bullock was produced for a video-taped deposition taken on August 7, 2012, for the purposes of trial due to Defendant Bullock's scheduling conflicts. ECF Nos. 29, 30. The video tape of his deposition, including Plaintiff's cross-examination of the witness, was presented in lieu of live testimony during trial.

## IV.  FINDINGS OF FACT[4]

On November 8, 2010, Detective Hope Hoover ("Detective Hoover") requested a warrant for 1945 Sigel Street. Trial Tr. 66:7-18, Aug. 20, 2012, ECF No. 32; Search Warrant 1, Defs.' Ex. 4. In support of probable cause for the warrant, Detective Hoover wrote the following:

> On 11/8/10 at approximately 3:40 p.m., at 1400 N. 10th Street the offender assaulted the complainant. The complainant states that she was a passenger in her vehicle, and that her son's father was driving. During an argument in the area of 10th and Jefferson Streets, the offender punched the complainant twice in the face. He continued to drive, and the complainant was unable to get out of the car. The offender was going through stop signs to prevent her from exiting the vehicle. The complainant's five year old son, and seven year old daughter were in the backseat of her 1995 purple dodge Intrepid. The complainant states that her child's father was angry and she was fearful of what he may do next. She was aware that his silver handgun was under the passenger seat in the vehicle. She grabbed it and was planning on exiting the moving vehicle. She stated to the assigned detective that she did not want to exit the car with her children and the gun still in the car. The offender struggled with her and gained control of the handgun. At 1400 N. 10th Street, she exited the moving vehicle. She then walked to 11th Street and saw the offender pull up in her vehicle. He took the two children out of the car and approached the complainant. He kicked her in the stomach, and left the area in complainant's vehicle. No injuries to either child or the complainant. The children are safe in the custody of the complainant. The vehicle is a 1995 Dodge Intrepid . . . . It is registered to the complainant. The complainant also has a valid PFA 1005V7354, against the male. It is a valid order from 5/24/10 to 5/23/13. The male's

---

[4]  The findings of fact are presented by way of narrative. <u>See</u> Fed. R. Civ. P. 52(a).

address was provided to the complainant, and it was
confirmed as offender's address provided during
previous arrests. The male is prohibited from owning a
firearm under CC 6105, and there is an active PFA.
A real estate check was conducted on the property on
1945 Sigel Street. The offender's mother is the owner
of the home. The affiant [Detective Hoover] requests a
search warrant to recover any evidence related to this
crime. The affiant respectfully requests a night time
search warrant due to time restrictions and severity
of the crime.

Search Warrant 2; Trial Tr. 69:11-71:11.

In the search warrant Detective Hoover identified a
"firearm relating to the crime" as an item to be searched or
seized, and Sakoue Armour as the person the police were
searching for at that address. Trial Tr. 67:2-24; Search Warrant
1. Furthermore, in the box marked as "violation of" it listed
the following violations: Violation of the Uniformed Firearms
Act ("VUFA"), Endangering the Welfare of a Child ("EWOC"),
aggravated assault, and related charges. Trial Tr. 68:1-10;
Search Warrant 1. Once Detective Hoover received the warrant
signed by a magistrate judge, she contacted the SWAT team to
serve the warrant. Trial Tr. 71:11-72:5. Detective Hoover
testified that she only works with the SWAT unit "if there has
been a prior criminal past, a violent criminal past, or a gun
involved." Id. at 65:17-21.

Detective Hoover met the SWAT team at 1945 Sigel on
November 8, 2010, at 9:01 p.m. Id. at 68:14-16, 71:24-72:5. Once
there, Detective Hoover waited for SWAT to tell her and her team

it was clear to proceed and to come into the house. Id. at
72:16-19. When she entered the home, there were two individuals,
a male and a female that were in the living room area. Id. at
72:24-73:1. She informed Plaintiff's mother, Janet Armour, that
there was a search warrant and provided her with a copy. Id. at
75:9-22, 76:5-8. She further testified that she did not make
physical contact with these individuals, that no arrests were
made, and that the job took approximately twenty to twenty-five
minutes. Id. at 73:2-12.

    When the SWAT unit arrived at 1945 Sigel Street on
November 8, 2010, Janet Armour, Plaintiff's mother, was sitting
in the living room on the first floor and noticed a light flash
across her window. Trial Tr. 43:21-44:1. She went to the window
to see what caused the light, and observed "all these officers
in black surrounding [her] house." Id. at 44:1-4. She then
"hollered upstairs and told [her] son [Plaintiff] there were
cops outside." Id. at 44:7-8. She then went to the door, and
said "can I help you," to which a voice said "open this door."
Id. at 44:9-10. Miss Armour obeyed and opened the door. Once she
did so, an unidentified officer told her to back up, and sit
down, and then pointed a "large weapon" at her head. Id. at
44:10-14. While she was doing so, the rest of the officers
entered the home, and she observed one group of officers go down

into the cellar, and another group go up the stairs to the second floor. Id. at 44:10-14.

Defendants Leatherberry, Bullock, and Sgt. Fraser were part of the SWAT unit assigned to executing the search warrant at 1945 Sigel Street on November 8th, 2010. Id. at 79:24-80:11, 99:6-18; Bullock Dep. 7:24-8:6, Aug. 7, 2012. These Defendants were assigned to the second floor of the house, meaning that their job that evening entailed securing the second floor. SWAT Unit Serv. Rep. 1, Defs.' Ex. 5; Trial Tr. 81:25-82:5, 101:17-102:4; Bullock Dep. 7:12-23. When Plaintiff heard Miss Armour state that the police were there, he proceeded out of an upstairs room into the hallway and saw Defendants.[5] Plaintiff testified that Defendants told him to freeze, and then told him to lie down on the floor, and Plaintiff complied with both commands. Trial Tr. 11:20-24. Once on the floor, Plaintiff testified that he was "jumped on," and felt sharp pains in his back, potentially from a "knee or a kick." Id. at 11:24-12:19. Plaintiff was subsequently handcuffed and pulled up from the ground, at which point Plaintiff testified that he saw a white

---

[5]    Plaintiff could not identify the Defendants in the courtroom that day as the same individuals who were upstairs on the second floor because he testified that on the night in question they had helmets on. Trial Tr. 11:10-22. However, the officers themselves testified that they were the individuals of the SWAT Unit assigned to the second floor. Id. at 79:24-80:11, 99:6-18; Bullock Dep. 7:12-23.

officer. Id. at 11:24-12:5, 20:9-14. Plaintiff further testified
that he was shown a picture of his brother and realized that
they were looking for his brother. Id. at 12:15-19. He said he
then asked the Defendants why they were "locking him up" and
told them they were "illegally seizing him," and they responded
with "oh we got a lawyer up here." Id. at 12:20-23. Plaintiff
testified that he was in the hallway "at least 45 minutes to an
hour" before they brought him downstairs. Id. at 12:24-13:14.

Miss Armour testified that she could hear Defendants
Leatherberry, Bullock, Sgt. Fraser, and Plaintiff talking
upstairs, while she was downstairs. Trial Tr. 45:12-21.
Specifically, she heard Plaintiff say he was watching his DVD
player and state that he knew what his rights were. Id. She
further heard an officer say "oh, we got a lawyer up here, get
him down, get him down." Id. She then heard tussling. Id.

Defendants Leatherberry, Bullock, and Sgt. Fraser
testified that they came up the stairs with Defendant Bullock
leading, Defendant Leatherberry in the middle, and Sgt. Fraser
in the back. Id. at 80:7-20, 103:18-20; Bullock Dep. 11:23-
12:21. Defendants were looking for the individual and weapon
identified in the search warrant. Trial Tr. 81:11-20, 102:7-18.
When they went to the second floor they met Plaintiff, and
Defendant Bullock ordered him to show his hands and then get
down on the floor. Id. at 80:7-16, 102:18-20; Bullock Dep.

12:13-14, 13:11-18.[6] Defendant Leatherberry testified that
Plaintiff "wasn't combative, but he wasn't compliant either."
Trial Tr. 80:17-18. Defendants testified that Sgt. Fraser placed
Plaintiff in custody and he was detained, while Defendants
Leatherberry and Bullock continued to clear the second floor.
Id. at 80:18-20, 102:12-18; Bullock Dep. 14:22-24. With respect
to why Defendants detained Plaintiff, Defendant Sgt. Fraser
testified as follows:

> Because, Your Honor, part of our duties are serving
> high risk warrants which usually include the potential
> danger to not only us and the other officers, but also
> individuals in the house. So, when we secure an
> individual we are searching for a person that is
> wanted for being involved in a violent crime and we
> are searching for weapons. While we have somebody on
> that floor we want to secure them so that they don't
> have an opportunity to retrieve any weapons that we
> may not have yet located and/or get a weapon to use
> against us.

Trial Tr. 102:23-103:9.

Defendants Leatherberry and Sgt. Fraser testified that
while they did have weapons on their persons, they did not point
their weapons at Plaintiff. Trial Tr. 81:19-21, 103:24-104:7.
Defendant Sgt. Fraser testified that while he did not
independently recall detaining the Plaintiff, based on the

---

[6]    None of the Defendants particularly recall whether the
lights were on or off in the second floor hallway. Trial Tr.
85:16- 86:4, 107:20-21; Bullock Dep. 18:7-13. Defendant
Leatherberry further testified that he did not have a have a
handheld flashlight nor a flashlight attached to his helmet that
evening. Trial Tr. 85:20-86:4.

organization of the second floor team, he would have been the one to secure Plaintiff. Id. at 102:7-18, 104:8-18, 114:14-24. He explained that normally in detaining someone, he would ask the person to lay on the floor, put his hands behind his back, and handcuff him while the search continued. Id. at 104:10-13. Defendant Sgt. Fraser testified that he did not lay upon Plaintiff's back or step on Plaintiff's back while detaining him, nor did he observe Defendants Leatherberry or Bullock engaging in these actions. Id. at 104:19-105:3. Moreover, Defendants Leatherberry and Bullock both testified that they did not step or lay on Plaintiff's back, nor did they see any other officer do so. Id. at 81:21-23; Bullock Dep. 16:6-14.

Finally, Defendants testified that Plaintiff was taken downstairs once the second floor and first floor were cleared. Trial Tr. 82:9-12; Bullock Dep. 15:22-23. Defendant Sgt. Fraser stated that once Plaintiff was brought downstairs and was determined not to be the targeted individual, he would have been released from handcuffs. Trial Tr. at 102:12-18. Defendant Leatherberry corroborated Defendant Sgt. Fraser in stating that once Plaintiff was identified and determined not to be a threat, his handcuffs were removed. Id. at 91:22-92:24.[7] While Defendant

---

[7]    Plaintiff on cross-examination spent significant time asking whether Defendants had a picture of the target individual they were looking for, that is Sakoue Armour, Plaintiff's brother. See, e.g., Trial Tr. 73:20-74:12, 87:14-89:17, 107:24-

Leatherberry does not know when the handcuffs were removed, he did recall seeing Plaintiff sitting on the couch "uncuffed" with his mother. Id. Plaintiff's mother, Miss Armour, also testified that when they brought him downstairs he was ordered to sit next to her, and they removed his handcuffs. Id. at 46:24-:47:16.[8] Plaintiff, on the other hand, testified that he was in handcuffs until the SWAT unit left, approximately an hour and ten minutes after the search began. Id. at 16:6-23. Miss Armour also testified that the police officers were at her house for "over an hour." Id. at 44:21-45:1.

---

108:18. Plaintiff testified that Defendant Bullock had a picture of Sakoue Armour when Defendants encountered Plaintiff on the second floor. Id. at 12:6-14. Defendant Sgt. Fraser testified that generally the SWAT unit does not have a picture of the individual they are looking for. Id. at 108:1-18. Defendant Leatherberry testified that he was not given a picture of Sakoue Armour. Id. at 87:14-19. Detective Hoover testified that while she had a picture of the Sakoue Armour, she did not give a copy of the picture to Defendants Leatherberry, Sgt. Fraser, or Bullock, nor did she know if the SWAT members had a copy of the picture. Id. at 73:20-74:18, 77:18-21. Defendants Leatherberry, Sgt. Fraser, and Bullock all consistently testified that Plaintiff was detained because they did not know who he was, and they needed to secure him until Detective Hoover could verify whether or not Plaintiff was the individual she was looking for. Id. at 95:16-18, 108:9-12, 112:14-19.

[8]    During cross-examination, Miss Armour testified that Plaintiff was still handcuffed when he was sitting next to her. Trial Tr. 57:19-58:9. However, she was confronted with her previous deposition testimony from May 30th, 2012, at which point she had testified that the officers had taken the "cuffs" off of Plaintiff when they brought him downstairs. Id. at 59:8-60:22.

Based on all of the Defendants' testimony and
Detective Hoover's testimony, the search in total took between
fifteen to thirty minutes. Id. 73:10-12, 81:16-18, 101:3-16;
Bullock Dep. 17:8-13. The SWAT Unit Service Report corroborates
this time assessment as it states that the time the search
commenced was 9:00 p.m. and the time the search was completed
was 9:30 p.m. SWAT Unit Serv. Rep. 1. Defendants testified that
they did not recover any weapons nor did they arrest any
individuals pursuant to the search. Trial Tr. 93:24-94:2,
103:10-12.

Plaintiff testified that as a result of this encounter
he had to receive medical treatment for his back. Id. at 15:24-
16-19:4. However, he only provided physical therapy records from
November 18, 2010, November 30, 2010, December 10, 2010,
December 21, 2010, and January 1, 2011. See Therapy Records,
Pl.'s Ex. 6.

The Court, as fact finder, finds Defendants' version
of the events more persuasive than Plaintiff's. First, Plaintiff
was evasive and hostile in his answers during cross-examination,
whereas Defendants were consistent in the sequence of events
which occurred as they secured the second floor. Specifically,
it is not entirely clear if it was dark in the second floor
hallway, but Defendants as a three-man entry team consisting of
two officers and one supervisor, were responsible for securing

13

the second floor in executing a search warrant on Sigel Street
on November 8, 2010. In executing their duties, Defendant
Bullock reached the second floor first, followed by Defendants
Leatherberry, and Sgt. Fraser, respectively. When they
encountered the Plaintiff, Defendants Bullock and Leatherberry,
passed Plaintiff back to Defendant Sgt. Fraser, who was
responsible for securing Plaintiff. Defendant Sgt. Fraser
secured Plaintiff by ordering him to lie on the floor, after
which he handcuffed him, while Defendants Bullock and
Leatherberry completed their search of the second floor.
Plaintiff was briefly detained on the second floor, and there is
no evidence, aside from Plaintiff's evasive testimony that any
of the Defendants, or particularly Defendant Sgt. Fraser, jumped
on, kicked, or kneed Plaintiff. Moreover, considering all of the
evidence, when Plaintiff was taken downstairs and determined not
to be Sakoue Armour, he was released from being handcuffed.
Lastly, the search appears to have taken no more than thirty
minutes to complete.


**V.    CONCLUSIONS OF LAW**

        The Court first must determine the appropriate
standard of review. Second, the Court must determine whether
Defendants Leatherberry, Bullock, and Sgt. Fraser unlawfully
seized or falsely arrested Plaintiff. Third, the Court must

14

determine whether Defendants Leatherberry, Bullock, and Sgt. Fraser used excessive force to apprehend the Plaintiff. Finally, the Court must determine whether Defendants Leatherberry, Bullock, and Sgt. Fraser failed to intervene to prevent a constitutional violation from occurring.

A.   Standard of Review

The plaintiff bears the burden of proof on the elements of a Section 1983 claim by a preponderance of the evidence. See, e.g., Groman v. Twp. of Manalapan, 47 F.3d 628, 638 (3d Cir. 1995). Plaintiff has to prove that in light of all of the evidence that his claims are more likely so than not.

B.   Unlawful Seizure and False Arrest

The Fourth Amendment guarantees, "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." While an arrest constitutes the most clear example of a seizure, actions short of arrest also count as seizures for Fourth Amendment purposes whenever a law enforcement officer, "by means of physical force or show of authority, has in some way restrained the liberty of a citizen." Terry v. Ohio, 392 U.S. 1, 19 n. 16. The degree of justification required to render a seizure reasonable under the Fourth Amendment varies according to the nature and scope of the detention: "some seizures . . . constitute such limited intrusions on the personal security of those detained and are

15

justified by such substantial law enforcement interests that they may be made on less than probable cause, so long as police have an articulable basis for suspecting criminal activity." Michigan v. Summers, 452 U.S. 692, 699 (1981). Thus the level of intrusion on a person's liberty determines whether an individual has been arrested or merely seized, and the corresponding level of justification required varies accordingly.

A seizure of the occupant of a house is reasonable during the execution of a search warrant in that house "to protect the police, to prevent flight, and generally to avoid dangerous confusion." Baker v. Monroe Tp., 50 F.3d 1186, 1191 (3d Cir. 1995) (citing Summers, 452 U.S. at 692). The existence of a warrant to search an individual's house means that a neutral and detached magistrate has already authorized a "substantial invasion of the privacy of the persons who reside[] there." Summers, 452 U.S. at 701. The detention of a resident during the search of the premises constitutes a substantially less intrusive invasion of privacy than the search itself. Id.[9] Moreover, such a seizure is often necessary to minimize the risk of harm to both the police and to occupants. Id. at 702-03.

---

[9]     The Supreme Court has also noted that a detention occurring in one's own residence largely avoids the social stigma, inconvenience, and indignity associated with, for example, a forced visit to a police station. Summers, 452 U.S. at 702.

An order to occupants of a searched residence to "get down" and the actions of officers in pushing occupants down to the ground is reasonable when the needs of law enforcement officials outweigh the burden imposed on affected citizens. Baker, 50 F.3d at 1192. In Baker, the Third Circuit found that such conduct was reasonable during the execution of a search warrant in a drug raid to ascertain the identity of the occupants, protect them from any stray gunfire, and generally allow the officers to proceed efficiently. Id.

Though there is no per se rule regarding the length of time a person may be detained before a detention becomes an arrest, the Court must examine the reasonableness of the detention by considering "whether the police were diligent in accomplishing the purpose of the stop as rapidly as possible." Id. Under United States v. Sharpe, 470 U.S. 675, 686 (1985), when "police are acting in a swiftly developing situation . . . court[s] should not indulge in unrealistic second-guessing."

Here, Defendants Leatherberry, Bullock, and Sgt. Fraser seized Plaintiff for a short length of time and in a reasonable manner considering the "substantial law enforcement interests" at stake. Summers, 452 U.S. at 699. In executing a search warrant for a gun, the risk of danger to both occupants and officers in the house is high, particularly when the gun's owner has a violent criminal history. Plaintiff was made to get on the

17

ground while Defendants determined his identity, ensuring that
he was not the individual that they were searching for. Once
such determination was made, Plaintiff was released from
handcuffs. The encounter in total lasted no more than thirty
minutes and Plaintiff has not presented sufficient evidence to
show that Defendants acted anything but diligently in the
execution of the warrant. As such, Plaintiff's seizure did not
rise to the level of an arrest and Plaintiff's false arrest
claim fails. Furthermore, the Court finds that Plaintiff has not
adequately demonstrated that his brief detention was unjustified
given the significant interest in protecting the police,
preventing flight, and generally preventing dangerous confusion.
Baker, 50 F.3d at 1191. Thus Plaintiff has not met his burden to
prove that his seizure was constitutionally unreasonable by a
preponderance of the evidence.

    C.   Excessive Force

       The Fourth Amendment prohibits the use of unreasonably
excessive force. Graham v. Connor, 490 U.S. 386, 394-95 (1989).
The police may use force "reasonably necessary to protect their
personal safety and to maintain the status quo during the course
of [a] stop." United States v. Hensley, 469 U.S. 221, 235
(1985). A "court should defer to the officer's observations and
judgments in reviewing the totality of the circumstances because
officers 'draw on their own experiences and specialized training

to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'" United States v. Focareta, 283 F. App'x 78, 83 (3d Cir. 2008) (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002) (citations omitted)).

The claim of excessive force requires analysis under the Fourth Amendment's "reasonableness" standard, giving careful attention to the facts and circumstances of each particular case. Graham, 490 U.S. at 396. The inquiry is an objective one[10] and requires "a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake," id. at 396, 397 (quoting Tennessee v. Garner, 471 U.S. 1, 8 (1985)), which includes weighing "whether the suspect posed an immediate threat to the safety of the officer or others, whether the suspect was actively resisting arrest, and the severity of the crime at issue." Curley v. Klem, 298 F.3d 271, 279 (3d Cir. 2002).

The "'reasonableness' of a particular use of force therefore must be judged from the perspective of a reasonable

---

[10]    "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." Graham, 490 U.S. at 397 (citations omitted).

officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Id. at 396-97. Accordingly, "'[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment.'" Id. at 396. The "safety risk inherent in executing a search warrant for weapons [is] sufficient to justify the use of handcuffs." Muehler v. Mena, 544 U.S. 93, 100 (2005).

Here, Defendants Leatherberry, Bullock, and Sgt. Fraser used force "reasonably necessary to protect their personal safety and to maintain the status quo." Hensley, 469 U.S. at 235. Plaintiff was pushed to the ground while Defendants secured the second floor and ascertained his identity. Plaintiff has not presented sufficient evidence to show that he was ever jumped on, kicked, or kneed by any of the Defendants. Once Defendants Leatherberry, Bullock, and Sgt. Fraser learned that Plaintiff was not the target individual, Sakoue Armour, he was released from handcuffs. Therefore, the Court finds that Plaintiff has not met his burden to show that it is more likely than not that each of Defendants Leatherberry, Bullock, and Sgt.

Fraser's use of force during Plaintiff's seizure was constitutionally unreasonable.

### D.   Failure to Intervene

Where "'a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable under § 1983.'" Smith v. Mensinger, 293 F.3d 641, 650-51 (3d Cir. 2002) (quoting Byrd v. Clark, 783 F.2d 1002, 1007 (11th Cir. 1986)). More specifically, if a police officer is present when another officer violates a citizen's constitutional rights, the first officer is liable under § 1983 if that officer had reason to know that a constitutional violation, such as excessive force, was being used, and that officer had "a reasonable and realistic opportunity to intervene." Smith, 293 F.3d at 651; see Johnson v. De Prospo, No. 08-1813, 2010 WL 5466255, at *4 (D.N.J. Dec. 30, 2010). Courts have held that such an opportunity exists only when excessive force is used "in [the officer's] presence or otherwise within his knowledge," Byrd v. Brishke, 466 F.2d 6, 11 (7th Cir. 1972), or if the officer saw his colleague use excessive force or had time to reach him. Putman v. Gerloff, 639 F.2d 415, 423-24 (8th Cir. 1981).

As a failure to intervene claim requires the existence of a constitutional violation, Plaintiff has also failed to meet

his burden with respect to his claim against Defendants Leatherberry, Bullock, and Sgt. Fraser. Because the Court found that Defendants Leatherberry, Bullock, and Sgt. Fraser did not unlawfully seize, falsely arrest, or use excessive force in seizing the Plaintiff, Defendants Leatherberry, Bullock, and Sgt. Fraser could not be liable for failing to intervene to prevent a constitutional violation. Accordingly, the Court finds that the Plaintiff has not met his burden by a preponderance of the evidence that Defendant Leatherberry, Bullock, and Sgt. Fraser failed to intervene to prevent a constitutional violation.

## VI.  CONCLUSION

For the reasons set forth above, the Court finds that Plaintiff has not met his burden of establishing unlawful seizure, false arrest, excessive force, and failure to intervene against Defendants Leatherberry, Bullock, and Sgt. Fraser. The Court will enter judgment in favor of Defendants on all claims and against Plaintiff. An appropriate order will follow.